1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

ADNAN NIJMEDDIN,

          Plaintiff,

   v.

JOE LIZARRAGA,

          Defendant.

Case No. 18-cv-05588-BLF

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

[Re: ECF 1]

Petitioner Adnan Nijmeddin is currently in the custody of Joe Lizarraga, acting warden at Mule Creek State Prison in Ione, California. On November 20, 2014, a jury convicted Nijmeddin of second-degree murder (Cal. Penal Code § 187) and found true that during the commission of the murder Petitioner personally used a deadly and dangerous weapon (§ 12022(b)). Petition at 3-4, ECF 1; Response at 1, ECF 14; ECF 14, Exh. A at 898-907; ECF 14, Exh. B at 2103-06; ECF 15, Exh. G at 7-8. The jury also convicted Nijmeddin of attempted voluntary manslaughter (§§ 664, 192(a)) and again found true that during the commission of the crime Petitioner personally used a deadly and dangerous weapon (§ 12022(b)). *Id.* Finally, the jury convicted Petitioner of assault with a deadly weapon (§ 245(a)). *Id.*

On January 22, 2015, the trial court sentenced Petitioner to an indeterminate term of fifteen years for second degree murder, to be served concurrently with a determinate term of one year for the use of a deadly and dangerous weapon during his commission of the murder, one year for attempted voluntary manslaughter, and four months for use of a deadly and dangerous weapon during the commission of attempted voluntary manslaughter. Petition at 4; Response at 2. Nijmeddin

has since unsuccessfully pursued direct review in California state court including issues 2-6 set forth in this Petition. ECF 15, Exh. C (Opening Brief), Exh. G (Court of Appeal Opinion), Exh. L (California Supreme Court Order Denying Petition for Review). Nijmeddin also filed a Petition for Writ of Habeas Corpus in the California Court of Appeal covering issue 1 of this Petition. ECF 15, Exh. F (Petition for Writ of Habeas Corpus). In his Petition, Nijmeddin alleged that trial counsel was ineffective for failing to secure additional funding and issue a subpoena for expert Albert Ferrari, whom counsel had already engaged as an expert witness for Petitioner. *Id*. at 14-18, 46-67. Nijmeddin also renewed ineffective assistance claims he raised on direct appeal, and argued that cumulative prejudice from the multiple acts of ineffective assistance required reversal of the judgment. *Id*. at 18-21, 68-92. The appellate court denied Nijmeddin's Petition for Writ of Habeas Corpus, ECF 15, Exh. H (Court of Appeal Order Denying Petition for Writ of Habeas Corpus), and the California Supreme Court denied Nijmeddin's subsequent petition for review, ECF 15, Exh. M (California Supreme Court Order Denying Petition for Review).

This matter now comes before the Court on a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(d). Having considered the parties' submissions, the record in the case, and the applicable law, the Court DENIES the petition. The Court TERMINATES as moot the motion for oral argument at ECF 32.

## I.     BACKGROUND

The following facts, presumed to be correct under 28 U.S.C. § 2254(e), are excerpted from the California Court of Appeal's decision. *See Brown v. Horell*, 644 F.3d 969, 972 (9th Cir. 2011):

### B. Evidence Adduced at Trial

[Petitioner] was represented by appointed counsel during a jury trial in November 2014. The following evidence was adduced at trial.

*1.     Christopher Powser*

Christopher Powser testified that he was living in Chinatown

in January 2012. According to Powser, Chinatown is "drug-infested" and characterized by drug-related violence, prostitution, and homelessness.

Powser was walking down Soledad Street in Chinatown late one afternoon in January 2012 when he observed [Petitioner] and Chino arguing about an EBT card. At the time, Powser was homeless and addicted to heroin and crack. He had used drugs about five hours earlier.

Powser testified that [Petitioner] was sitting in his vehicle, a Ford Explorer, and Chino on the sidewalk. [Petitioner] was irate; he threatened to hit Chino with his vehicle if he walked into the street. According to Powser, Rajah "came out of nowhere with [a] chair above his head and threw the chair at the vehicle," breaking the windshield. Powser described Rajah as "a pretty good sized guy," approximately 6 feet 1 inch tall and between 180 and 200 "something" pounds. After the chair hit the windshield, [Petitioner] reversed his vehicle "really fast," angled it towards the sidewalk, and drove up onto the sidewalk "at a high rate of speed" in the direction of Chino, Rajah, and Powser. Powser testified he and Chino would have been hit had they not moved out of the way. The Ford Explorer hit a shopping cart and a building and may have clipped Rajah's leg. [Petitioner] reversed off the sidewalk, drove North towards Lake Street for about 10 feet, and turned around using a three-point turn in order to follow Rajah, who was running south towards Market Way. Rajah ran into a lot on the corner of Market and Soledad. [Petitioner] followed him into the lot, chasing him at a distance of eight or nine feet. Rajah tripped and fell and [Petitioner] ran over him.

Powser was unsure how the Ford Explorer's passenger side view mirror became detached. He did not see anything thrown at the Ford Explorer other than the chair.

2.    *John Henry Thomas*

John Henry Thomas testified that, on the day of Rajah's death, he and Rajah were walking together on Soledad Street. Thomas observed two of his friends, [Petitioner] and Chino, arguing loudly. He heard Chino tell [Petitioner] to get out of his vehicle, to which [Petitioner] responded "stand in front of the car." Thomas took [Petitioner]'s statement to mean "stand in front of the car [and] I'll run you over." Rajah told Thomas "I'm not going to let him talk to my friend like that." Rajah then picked up a chair that was sitting on the sidewalk and threw it at [Petitioner]'s vehicle. The windshield did not break according to Thomas. [Petitioner] reversed the vehicle and then "jumped the curb and went after [Rajah] and Chino with the vehicle." [Petitioner] then reversed off the sidewalk and followed Chino and Rajah, who ran to a dirt lot on the other side of the street. Thomas's view of the lot was obstructed, but he heard what sounded like a vehicle hitting a person. When [Petitioner]'s vehicle came back into view, Thomas observed [Petitioner] stop the vehicle, look back

3

in Rajah's direction, and then drive away.

Thomas, then a drug user, had smoked cocaine about an hour prior to the incident.

### 3.   Glenda Crawford

Glenda Crawford testified that she was present when Rajah was killed. Prior to Rajah's death, she was sitting in a chair across the street from where [Petitioner] and Chino were arguing about an EBT card. Others joined the fight until [Petitioner] was arguing with "[q]uite a few people," including Rajah and "a girl they called Killer." Crawford saw a "crowd" of 15 to 20 people standing in front of [Petitioner]'s vehicle and heard [Petitioner] tell them "I'm going to run you over in front of my truck." She saw Rajah throw a crate and a chair, which hit [Petitioner]'s vehicle. Others threw bottles and crates at [Petitioner]'s vehicle. [Petitioner] reversed his vehicle and then drove up onto the sidewalk, in what Crawford saw as an attempt to scare the crowd. [Petitioner] then reversed off the sidewalk and chased Rajah in his vehicle. Rajah ran into the dirt lot. [Petitioner]'s vehicle was "maybe five feet behind" Rajah; it was "right on him," "so close." Rajah tripped over a curb, fell, and [Petitioner] ran over him. As Rajah tried to get up, [Petitioner] backed over him. The vehicle drove forward again with Rajah dragging underneath.

Crawford testified she had used heroin early in the morning the day of the incident.

### 4.   Darrell Lamb

Darrell Lamb, another eyewitness, testified that he was sitting in a chair on Soledad Street when he observed a fight between Chino and [Petitioner]. [Petitioner] told Chino to get "out here on the street and I'll run you over." Rajah threw a chair at [Petitioner]'s vehicle, breaking the windshield. Lamb did not observe anyone else throw objects at [Petitioner]'s vehicle. [Petitioner] drove up onto the sidewalk, hitting Rajah with the side view mirror, breaking it off. Chino jumped out of the way or he would have been hit too. The vehicle hit two shopping carts as well but not the building. Rajah ran across the street to the dirt lot. [Petitioner] followed him in his vehicle. [Petitioner] was about 15 feet behind Rajah and gaining on him. Rajah fell to the ground and [Petitioner] ran over him.

### 5.   [Petitioner]'s Arrest

Officers followed a trail of oil or other automotive fluid from the scene to [Petitioner]'s Ford Explorer, which they found parked in a lot behind an automotive shop. An employee of the automotive shop testified that [Petitioner] drove to the back of the shop, parked, and, as he passed by, asked if they could look at the vehicle because it was making "a bad noise." [Petitioner] seemed to be in a hurry.

Officers determined that [Petitioner] was in the building next door to the automotive shop. Using a PA system on a police car, they called for [Petitioner] to come out of the building for 23 minutes. Eventually, [Petitioner] came out and was taken into custody

### 6.   Michael Rivera

Michael Rivera, a detective with the Salinas Police Department, testified that he interviewed [Petitioner] on the evening of January 17, 2012. A recording of that interview was played for the jury.

During the interview, [Petitioner] explained that he made money by giving rides in his car to people in Chinatown. He claimed that earlier that day he drove into the dirt lot to "make a deal" with Rajah and Chino, but instead the men had robbed him of his EBT card and his pills and threw objects at his vehicle. [Petitioner] told Rivera that Rajah had broken his windshield with a chair and pulled off the vehicle's passenger side mirror. [Petitioner] denied hitting anyone with his vehicle.

### 7.   Additional Prosecution Evidence

A hatchet was recovered from underneath the driver's side floor mat of [Petitioner]'s vehicle.

Anthony William McFarland, an accident investigator with the California Highway Patrol, inspected [Petitioner's] vehicle, a 1996 green Ford Explorer, after the incident. The purpose of his inspection was to identify any mechanical conditions that might have contributed to the incident. He found none.

### 8.   [Petitioner]

[Petitioner] testified in his own defense. He said that in January 2012 he weighed 157 pounds. He was living near Chinatown in Salinas and he went there most days. He had cultivated a persona in Chinatown of "Crazy Ed." He did not want to be viewed as a nice guy because "If you're a nice guy, they'll just take your stuff or they'll run you off."

On the day of the incident, [Petitioner] was driving down Soledad Street when he saw Chino. [Petitioner] had accidentally given Chino his EBT card, so he stopped and asked Chino to return it "[f]or the umpteenth time." As he had in the past, Chino refused and challenged [Petitioner] to a fight. While Chino and [Petitioner] were arguing, Rajah walked up and threw a chair at [Petitioner]'s windshield, which broke as a result of the impact. Rajah then pulled the side view mirror off the vehicle and threw it at the windshield. In [Petitioner]'s view, Rajah was trying to get him out of his vehicle so Rajah could "beat the crap out of" him.

[Petitioner] testified that people across the street were

United States District Court
Northern District of California

throwing bottles at the vehicle as well. [Petitioner] "panicked." He tried to put his car in reverse but, because he had been in neutral and not park, he put it in drive and lurched forward onto the sidewalk. After realizing his mistake, he reversed. By this time, Chino and Rajah had gone to the other side of the street. They were standing in the driveway to the dirt lot with two or three other people. Everyone in the group was throwing objects at [Petitioner]'s vehicle. A girl named Killer said "Get him Billy" to Rajah. [Petitioner] was "panic stricken"; he urinated in his pants and lost his sense of hearing.

[Petitioner] "decided" to drive towards the crowd "to scatter them" because if he just left Chinatown he "would never be able to go back there." Or if he did go back, he would be "easy prey for anybody because [he] got run out of Chinatown." [Petitioner] testified that he "probably should have just went straight down Soledad Street and went home," but he "wasn't thinking." He knew that if the "mob" "got a hold of" him, "that was going to be the end of" him. [Petitioner] made a three-point turn and "accelerated quickly" towards the lot. At one point, he was 10 feet behind Rajah. [Petitioner] testified his vision was obscured by the setting sun, cracks in his windshield, dirt on his vehicle, and the fact that he was wearing an old pair of glasses with an out of date prescription. He lost sight of Rajah. He could not find the exit so he hopped the curb and drove away towards home. He was not aware he hit anything.

When [Petitioner] came to a stop sign, he noticed steam coming out of his vehicle and heard it making a strange noise. He parked his vehicle at an auto body shop next to where he lived and asked them to look at it. He was in a hurry because he had wet his pants.

[Petitioner] then went home, which at that time was another auto body shop. He rented the corner of a room, which the owner used to use to play music with his friends. The room housed musical instruments and was sound proofed. Accordingly, he never heard the police calling to him. He learned they were outside when a friend called to inform him of that fact. [Petitioner] called 911 to inform the police that he was coming out, which he did.

[Petitioner] admitted that he lied to Detective Rivera on the night of the incident when he said that Chino and Rajah had robbed him.

ECF 15-4, Exh. G at 2-7.

## II.   LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district

court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). In addition, the federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). *Ylst v. Nunnemaker*, 501 U.S. 797, 801– 06 (1991).

The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (not dicta) existing at the time of the relevant state court decision, because only the

Supreme Court's holdings are binding on the state courts. *See Williams*, 529 U.S. at 412. Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, the AEDPA sets forth a highly deferential standard for evaluating state court rulings: It requires a state prisoner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear. "[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 2197–98 (internal quotations omitted).

With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## III.   DISCUSSION

Nijmeddin asserts the following claims for relief:

> 1.      Petitioner was deprived of his Sixth Amendment right to effective assistance of counsel based on defense counsel's failure to present testimony of an accident reconstruction expert.
>
> 2.      Petitioner was deprived of his Sixth and Fourteenth Amendment rights when the trial court failed to *sua sponte* instruct the jury on self-defense.

3.       Petitioner was deprived of his Sixth and Fourteenth Amendment rights when the trial court failed to *sua sponte* instruct the jury on imperfect self-defense voluntary manslaughter as a lesser included offense.

4.       Petitioner was deprived of his Sixth and Fourteenth Amendment rights when the trial court erred in excluding evidence that a victim had cocaine in his blood and defense counsel was ineffective in failing to obtain a ruling on the admissibility of this evidence

5.       Petitioner was deprived of his Fourteenth Amendment due process rights when the trial court admitted evidence of a photograph of an axe found by police in Petitioner's car when there was no indication Petitioner used or threatened to use the axe.

6.       Defense counsel was ineffective in failing to request a limiting instruction that the axe found in Petitioner's car could not be used to show bad character or a propensity to use weapons.

7.       Petitioner was deprived of his constitutional right to due process by the cumulative effect of the above errors.

The Court addresses the claims *seriatim*. As to each, the Court considers whether there has been a constitutional violation and if so, whether any error was prejudicial.

### A. Ineffective Assistant of Counsel: Testimony of Accident Reconstruction Witness

Petitioner contends that he was deprived of his Sixth Amendment right to effective assistance of counsel at trial because his counsel failed to secure and present testimony from his "star witness," accident reconstruction expert Albert Ferrari. Petition at 16-43. According to Petitioner, Ferrari "would have substantially corroborated [P]etitioner's trial testimony that his killing of victim Billy Rajah ('Rajah') by striking him with his vehicle was accidental." *Id*. at 16. Ferrari was expected to testify that the evidence was inconclusive as to whether Nijmeddin intended to strike Rajah and that it was "probable that Rajah unexpectedly stumbled and fell as he ran." *Id*. at 16-17; *see also id*. at 20-23. Petitioner further argues that at the time of trial, defense counsel had not only already retained Ferrari with court-appointed funds, but that the trial court had ruled Ferrari could testify. *Id*. at 22.

9

To garner relief on a claim of ineffective assistance of counsel a defendant must show both that his or her attorney provided deficient performance, and that prejudice ensued as a result. *Strickland v. Washington*, 466 U.S. at 687-96. To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id*. at 689. In other words, in evaluating allegations of deficient performance the reviewing court's scrutiny of counsel's actions or omissions is highly deferential. *Id*. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. The defendant's burden is to show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id*. at 687. The issue is not what the best lawyer would have done, or even what a majority of good lawyers would have done, but whether some reasonable lawyer could have acted in the challenged manner when facing the same circumstances as counsel in the present case. *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *cert. granted*, *judgment rev'd on other grounds*, *Calderon v. Coleman*, 525 U.S. 141 (1998). The inquiry into counsel's performance is "extremely limited." *Id*.

Additionally, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Thus, a federal habeas court must use "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

Petitioner did not raise this argument on direct appeal. ECF 15, Exh. C at 78-85 (arguing

that the Court's failure to appoint independent counsel deprived Petitioner of Sixth Amendment rights). The Court of Appeal thus did not consider this issue in its well-reasoned decision affirming the trial court. *See generally* ECF 15, Exh. G. Petitioner did, however, raise the argument in his later-filed state habeas petition. ECF 15, Exh. F at 46-67. The California Court of Appeal denied Petitioner's habeas petition without comment. ECF 15, Exh. H. Petitioner subsequently filed a petition for review in the California Supreme Court, arguing that he had stated a prima facie case for habeas relief because Defense Counsel Rutledge's "failure to secure a response to his funding request" and his failure thereafter "to subpoena expert witness Ferrari upon receiving no response to his funding request" constituted ineffective assistance of counsel. ECF 15, Exh. J at 19-36; *see also* Response at 2-3 (explaining procedural history). The California Supreme Court denied the review petition without comment. ECF 15, Exh. M. This Court "must determine what arguments or theories supported or, . . . could have supported" the California Supreme Court's decision rejecting the claim. *Harrington*, 562 U.S. at 102.

Applying this standard, the Court concludes that the California Supreme Court reasonably applied *Strickland* in rejecting Petitioner's present ineffective assistance claim. *See* 28 U.S.C. § 2254(d)(1) (habeas relief appropriate where a state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"). The California Supreme Court could have reasonably concluded that Petitioner failed to establish that Defense Counsel Rutledge's failure to secure and present Ferrari's expert testimony fell below prevailing standards of reasonable attorney performance. *Harrington*, 562 U.S. at 111 ("[I]t would have been reasonable to find that Richter had not shown his attorney was deficient under *Strickland*.").

Several arguments and theories could have supported the California Supreme Court's conclusion. *Harrington*, 562 U.S. at 102. In deciding whether to hire an expert, counsel is entitled to take into consideration whether he is likely to obtain funding from the trial court. *Murtishaw v.*

11

*Woodford*, 255 F.3d 926, 946, 948 (9th Cir. 2001) ("Nor was Faulkner constitutionally deficient for failing to obtain a confidential PCP expert. As discussed earlier, Faulkner was under the reasonable impression that the court was unwilling to provide additional funding for confidential experts."); *see also Strickland*, 466 U.S. at 681 ([T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). "[I]it is not necessarily ineffective to tailor one's investigations to limitations of time and money." *Runningeagle v. Ryan*, 825 F.3d 970, 983 (9th Cir. 2016).

In his petition to the state court, Nijmeddin included a declaration from Defense Counsel Rutledge. *See* ECF 15, Exh. F at 96-98. In this declaration, Defense Counsel Rutledge stated

> [A]t least one month prior to trial, my office requested funds from the Alternate Defender's Office, to compensate Mr. Ferrari for his trial testimony. Prior to trial, Mr. Ferrari's costs for investigating the facts had run approximately double of the contract rate. The Alternate Defender's Office paid for these investigation costs. However, when my office requested additional funding for Mr. Ferrari's testimony at trial, we never received an answer. My investigator made several requests to determine if we would receive approval for Mr. Ferrari's trial testimony, but the Alternate Defender's Office never responded to our request for trial funds.
>
> I did not subpoena Mr. Ferrari to testify on behalf of Mr. Nijmeddin at trial because I believe that there were no funds to pay for Mr. Ferrari's trial testimony.

*Id.* at 97. Petitioner also submitted the declaration of Frank Dice, Chief of the Alternate Defender's Office ("ADO"). *Id.* at 100-101. In his declaration, Dice states that he was "sure that the written request in the Nijmeddin case was sent to my office. It is clear that I never acted on the request. . . Mr. Rutledge did not talk to me personally about the request; however, it is clear my office did not process the paperwork . . . I respect Mr. Rutledge, but he did not call me." *Id.* at 101. Finally, Petitioner submitted the declaration of Ferrari himself. ECF 15, Exh. F at 103. Ferrari declared that Defense Counsel Rutledge had told him prior to trial that his testimony was crucial to the case. Ferrari also declared that he was told that that funding for trial testimony was denied.

*Id*. Ferrari lastly declared: "If I had been subpoenaed to trial, I would have appeared and testified consistently with the findings and conclusions I set forth in my report. I would, however, have billed for the time and expenses incurred by my testimony, and I would have expected to be paid after the fact." *Id*.

Considering all relevant circumstances, it was rational for the state court to determine that Defense Counsel Rutledge's assistance did not fall below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688. In particular, the California Supreme Court could have determined that it was reasonable for Defense Counsel Rutledge to conclude that requested additional funding would not be forthcoming. *Id*. at 688. The state court could have rested this conclusion on the fact that (1) Ferrari's costs for investigating the case had run approximately double of the contract rate, (2) the ADO never responded to Defense Counsel Rutledge's request for additional funding for Ferrari's trial testimony, and (3) Defense Counsel Rutledge's investigator followed up with the ADO several times about the request to no avail. *See* ECF 15, Exh. F at 96-98. While *Strickland*'s requirements are far from trivial, they do not allow a court to prescribe what a lawyer should have ideally done. *See id*. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task.").

Nijmeddin's petition fails to alter this conclusion. As an initial matter, the Court highlights that Petitioner points to various choices made by Defense Counsel Rutledge and argues that no reasonably prudent lawyer would have made such a choice. *See, e.g.*, Petition at 27 ("If an ordinarily prudent lawyer were faced with the possibility that his or her star expert witness could not be compensated for trial testimony, that prudent lawyer would have investigated . . ."). But that is not the applicable standard of review: "[t]he pivotal question is whether the state court's application of

the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101.

Nijmeddin also points to *Hinton v. Alabama*, 571 U.S. 263 (2014) in support of his claim. In *Hinton*, the prosecution case centered on the state experts' conclusion that six bullets had been fired from petitioner-defendant Hinton's revolver. 571 U.S. at 273. Although rebutting the prosecution's case required a competent defense expert, Hinton's defense counsel felt he was "stuck" with an ineffective, unqualified expert because he could not find a better expert willing to work for $1,000. *Id*. at 268, 273. Trial counsel erroneously believed that he was unable to obtain more than $1,000 to cover expert fees under Alabama state law. *Id*. at 273. In reality, "Alabama law provided for state reimbursement of 'any expenses reasonably incurred in such defense to be approved in advance by the trial court.'" *Id*. (quoting Ala. Code § 15–12–21(d)). Trial counsel did not seek further funding for an expert, even though the trial judge expressly invited Hinton's trial attorney to file a request for further funds. *Id*. The Supreme Court concluded that "[t]he trial attorney's failure to request additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he had received all he could get under Alabama law constituted deficient performance." *Id*. at 274. The court explained in its *per curiam* opinion:

> Hinton's attorney knew that he needed more funding to present an effective defense, yet he failed to make even the cursory investigation of the state statute providing for defense funding for indigent defendants that would have revealed to him that he could receive reimbursement not just for $1,000 but for "any expenses reasonably incurred." An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.

*Id*. Here, there is no indication that Defense Counsel Rutledge "failed to make even the cursory investigation of the state statute providing for defense funding." *Id*. To the contrary, it is undisputed that Defense Counsel Rutledge applied for funding from the ADO and that Defense Counsel Rutledge's investigator followed up on this request multiple times. ECF 15, Exh. F at 97. And the

Chief of the Alternate Defender's Office traced the alleged error to his office's failure to act—not Defense Counsel Rutledge. *See id*. at 101 ("I am sure that the written request in the Nijmeddin case was sent to my office. It is clear that I never acted on the request . . . it is clear my office did not process the paperwork.").  Nor did Defense Counsel Rutledge's ignorance of the law lead to his failure to procure Ferrari as an expert witness at trial.

Petitioner further suggests that had Defense Counsel Rutledge called the ADO and followed up on his request for additional funding, the ADO would likely have approved the request. Petition at 26; *see also id*. at 35 ("The strong implication from Mr. Dice's declaration is that the request for funding in addition to the $19,000 which had already been approved for Mr. Ferrari would have been granted."). "This is both speculative, and smacks of the judgment in hindsight forbidden by *Strickland*." *Runningeagle*, 825 F.3d at 984. Indeed, nowhere does ADO Chief Dice indicate that he intended to approve Defense Counsel Rutledge's request. This argument also ignores the fact that while Defense Counsel Rutledge did not call the ADO himself, he did instruct his investigator to follow up with the ADO multiple times. ECF 15, Exh. F at 97. Finally, Petitioner contends that it was unreasonable for Defense Counsel Rutledge to not subpoena Ferrari to testify at trial. Petition at 27-28. But Ferrari himself declared that he would have expected to have been compensated for such testimony. ECF 15, Exh. F at 103. And this Court cannot find that a reasonable lawyer, when faced with similar circumstances, would have risked footing the bill for Ferrari's testimony. *See Coleman*, 150 F.3d at 1113.

The Court need not reach Petitioner's argument under the second prong of *Strickland*; nonetheless, the Court briefly highlights that the California Supreme Court could have reasonably supported its denial of Petitioner's claim based on *Strickland*'s second prong. Petitioner classifies Ferrari as his star witness and delineates a wide range of testimony he expected from Ferrari at trial. *See* Petition at 19-24; *see also* ECF 15, Exh. F at 103. But Petitioner ignores that the trial court had ruled that it was not going to permit Ferrari, an expert in traffic collision reconstruction, to testify

15

about Petitioner's intent, mindset, and motivations or to provide conclusions regarding the focus of Petitioner's attention at the time of the incident, because there was no showing of Ferrari's expertise in those specific areas. ECF 14-11, Exh. B-Augment at 310-312; *see, e.g., id*. at 310 ("But when you go broadly into issues of intent, psychological motivations, drug impact, it's too far."). The trial court also cabined the ability of the defense to introduce certain video reenactments, stating "I think to show a rendition or a version that is not consistent with the evidence is asking the jury to speculate . . . So that would be the Court's ruling at this time as to videos that do not show or reenactments that do not show a version of events that are not provided by the witnesses." *Id*. at 313-314. These limitations would have blunted the impact of Ferrari as an expert witness. It would have been reasonable for the California Supreme Court to have determined that the absence of Ferrari's testimony was not prejudicial—particularly in light of Nijmeddin's own testimony at trial, which made clear his malice for Chino and Billy. ECF 15, Exh. G at 6 ("Defendant 'decided' to drive towards the crowd 'to scatter them' because if he just left Chinatown he 'would never be able to go back there.'"); *see also* ECF 14, Exh. A at 799 ("I see him all the time. We've had an exchange of words before, he was threatening towards me. He's been trying to intimidate me and shit."), 819 ("And if you're following people like Chino and Billy, that's what's going to happen, you're going to get jacked and you're going to get this… you hang out down Chinatown and you're gonna, you know, you're gonna, you're hanging out with the scum of the earth, basically.").

In sum, because the California Supreme Court could have reasonably concluded that Defense Counsel Rutledge provided Nijmeddin with adequate representation under *Strickland*, Nijmeddin's ineffective assistance of counsel claim fails.

### B.  Failure to Instruct on Perfect Self-Defense

Petitioner contends that the trial court's failure to *sua sponte* instruct the jury on perfect self-defense prejudicially violated his Sixth and Fourteenth Amendment rights to instructions on the elements of murder, as well as his state right to instructions on affirmative defenses. Petition at 2,

United States District Court
Northern District of California

44-55. According to Petitioner, there was sufficient evidence to require an instruction on perfect self-defense. *Id*. at 49-55.

On direct appeal, Petitioner argued that the trial court prejudicially erred under state law and the Sixth and Fourteenth Amendments in failing to instruct the jury with CALCRIM No. 505 regarding perfect self-defense. ECF 15, Exh. C at 19. The California Court of Appeal rejected the claim by written opinion. ECF 15, Exh. G at 9-11. The Court of Appeal's opinion was the last-reasoned decision addressing the issue because the California Supreme Court's rejection of Nijmeddin's review petition was a one-line denial. *Ylst*, 501 U.S. at 803.

CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another, reads in relevant part:

> The defendant is not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter) if (he/she) was justified in (killing/attempting to kill) someone in (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if:
>
> 1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] <insert name or description of third party>) was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being (raped/maimed/robbed/<insert other forcible and atrocious crime>)];
>
> 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;
>
> AND
>
> 3. The defendant used no more force than was reasonably necessary to defend against that danger.
>
> Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to (himself/herself/ [or] someone else). Defendant's belief must have been reasonable and (he/she) must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the

17

[attempted] killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have
believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

. . .

[A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of (death/great bodily injury/<insert forcible and atrocious crime>) has passed. This is so even if safety could have been achieved by retreating.]

[Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.]

The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter).

CALCRIM No. 505, Judicial Council of California Criminal Jury Instructions, at 253-54 (Fall 2014 ed.).

The state appellate court ruled:

Defense counsel did not request that the jury be instructed with CALCRIM No. 505, which provides a defendant is not guilty of murder if he or she was justified in killing the victim in self-defense. [Petitioner] maintains the trial court erroneously failed to sua sponte instruct the jury regarding perfect self-defense.

*1. Legal Principles*

"Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) "'"The defendant's fear must be of imminent danger to life or great bodily injury."'" (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) And the defendant must have "used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 505.)

Trial courts have a limited duty to instruct, sua sponte, on particular defenses. (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

18

That duty arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*Ibid.*) " 'Substantial evidence' in this specific context is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded'" that the particular facts underlying the instruction did exist.'" (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139.) When the trial court believes there is substantial evidence supporting a defense that is inconsistent with that advanced by the defendant, the court should ascertain from the defendant whether he or she wishes instructions on the alternative theory. (*People v. Breverman* (1998) 19 Cal.4th 142, 157 (*Breverman*).) "'"Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the [defendant]."'" (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

On appeal, we determine independently whether substantial evidence to support a defense existed. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.)

*2. There Was Insufficient Evidence to Require Sua Sponte Instructions on Perfect Self-defense*

A perfect self-defense instruction was warranted if there was substantial evidence that defendant (1) actually and reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; (2) reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and (3) used no more force than was reasonably necessary to defend against that danger. (CALCRIM No. 505.)

Here, there was no evidence as to the third element of perfect self-defense— that deadly force was reasonably necessary to defend against the danger posed by Rajah and others throwing objects at [Petitioner]'s vehicle. [Petitioner] testified that he "decided . . . to scatter" the crowd by driving in their direction. In order to do so, he had to execute a three-point turn. [Petitioner] implicitly acknowledged that he could have driven away instead, testifying that he "probably should have just went straight down Soledad Street and went home." [Petitioner] explained that he did not take that option because, "if I [had] left Chinatown that day, I would have been punked. I would never be able to go back there . . . because I got run out of Chinatown." The foregoing evidence shows that [Petitioner] could have escaped any danger Rajah posed by driving away. The use of deadly force was not necessary. Rather, it was a choice [Petitioner] made, not to protect himself, but to preserve his reputation and standing in Chinatown.

For the foregoing reason, the trial court did not err by failing to sua sponte instruct on perfect self-defense.

ECF 15, Exh. G at 9-11.

Petitioner now argues that the Court of Appeal's conclusion that there was not sufficient evidence to support a self-defense instruction was "contrary to the record and the settled rule requiring a court to examine the totality of the evidence. Accordingly, the Court of Appeal's conclusion that there was no error in failing to instruct on perfect self-defense... was an unreasonable application of settled constitutional law." Petition at 44.

When a habeas claim rests on an alleged constitutional error arising from a jury instruction, the question is whether the alleged instructional error "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 70–71 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The challenged instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146–47. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Thus, a habeas petitioner whose claim involves the failure to give a particular instruction bears an "especially heavy" burden. *Id.* at 147, 154. Even if instructional error is found to rise to the level of a constitutional violation under this standard, federal habeas relief is unavailable unless "the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. at 147 (1998) (citing *Brecht*, 507 U.S. at 637).

Petitioner first argues that the trial court's failure to instruct the jury on perfect self-defense violated his right under California law. Petition at 44-46. A claim predicated on state law is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 71-72 ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986) (claims that merely challenge correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights) (citation omitted).

Petitioner further argues that the trial court's failure to instruct the jury on perfect self-defense was an unreasonable application of *Mathews v. United States*, 485 U.S. 58, 63-64 (1988), and its rule that a "defendant has a constitutional right to instruction on recognized defenses for which sufficient evidentiary support exists." Petition at 44-46, 49-51. But Petitioner is not entitled to habeas relief for the omission of an affirmative defense instruction on self-defense because there is no clearly established constitutional right to have an affirmative defense jury instruction. 28 U.S.C. § 2254(d)(1). The Supreme Court has held *as a matter of federal criminal procedure* that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." 485 U.S. at 63 (citing *Stevenson v. United States*, 162 U.S. 313 (1896), 4 C. Torcia, Wharton's Criminal Procedure § 538, p. 11 (12th ed. 1976)). The Supreme Court has not, however, held that this right is guaranteed under the Constitution. Nor has Petitioner offered any Supreme Court caselaw to this end. To the contrary, the Supreme Court has recognized that, although the constitutional guarantee of a "meaningful opportunity to present a complete defense" encompasses the exclusion of evidence and the testimony of defense witnesses, it does not speak to "restrictions imposed on a defendant's ability to present an affirmative defense." *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993) (holding that even where jury instructions "created a risk that the jury would fail to consider evidence that related to an affirmative defense" state defendant's claim of instructional error would create new rule that could not be the basis for federal habeas relief); *see also Hicks v. Carey*, 220 F. App'x 467, 468 (9th Cir. 2007) ("Hicks contends this failure deprived him of the right to present a defense because a defendant is entitled to an instruction as to a recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *See Mathews v. United States*, 485 U.S. 58, 63 (1988). It is far from clear whether the failure to instruct a jury as to such an entrapment defense is an error rising to constitutional dimensions."); *Guerra v. McDowell*, No. CV 17-2193-AB (PLA), 2017 WL 4216977, at *8 (C.D. Cal. June 22, 2017), *report and recommendation adopted*, No. CV 17-2193-AB (PLA),

2017 WL 4216558 (C.D. Cal. Sept. 18, 2017) (finding no clearly established right to affirmative defense instruction).

Accordingly, the state court's decision cannot be said to be contrary to, or an unreasonable application of, clearly established federal law as decided by the Supreme Court. *See Carey*, 549 U.S. at 77; 28 U.S.C. § 2254(d). Nijmeddin's claim fails.

## C. Failure to Instruct on Imperfect Self-Defense

Petitioner contends that the trial court's failure to *sua sponte* instruct on imperfect self-defense voluntary manslaughter as a lesser included offense violated his rights under the Sixth and Fourteenth Amendments. Petition at 2, 55-60. According to Petitioner, evidence was presented at trial that he "actually, but unreasonably, believed that he was in imminent danger of suffering great bodily injury at the hands of Chino, Rajah, or others in Chinatown." *Id*. at 56. His argument is grounded in the Supreme Court's decisions in *Mathews* and *Mullaney v. Wilbur*, 421 U.S. 684 (1975). *Id*.

CALCRIM No. 571, Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser Included Offense, reads in relevant part:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> The defendant killed someone because of a sudden quarrel or in the heat of passion if, one, the defendant was provoked. Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. And, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation. That is, from passion rather than from judgment.

CALCRIM No. 571, Judicial Council of California Criminal Jury Instructions, at 347-350 (2020).

The state appellate court ruled in relevant part:

> Defendant argues the trial court erroneously failed to sua sponte instruct the jury with CALCRIM No. 571 regarding imperfect self-defense when defense counsel did not request that instruction.

*1. Legal Principles*

Imperfect or unreasonable self-defense involves a "subjectively" real but "objectively unreasonable" belief in the need to defend. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Where a defendant kills in an actual but unreasonable belief in the need for self-defense, he or she is guilty of voluntary manslaughter. (*People v. Elmore* (2014) 59 Cal.4th 121, 133-134 (*Elmore*).) Thus, imperfect self-defense is not a defense, but a lesser offense included in the crime of murder. (*Breverman*, *supra*, 19 Cal.4th at p. 159.)

"A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).) " '[W]hen a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.' " (*Breverman*, *supra*, 19 Cal.4th at p. 159.) "[R]egardless of the tactics or objections of the parties, or the relative strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on any and all lesser included offenses, or theories thereof, which are supported by the evidence. In a murder case, this means that both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support." (*Id*. at p. 160.)

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.] Moreover, . . . the sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence, substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Breverman*, supra, 19 Cal.4th at pp. 162-163.) "This means that substantial evidence of heat of passion and unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the states of mind on which these theories depend were absent." (*Id*. at p. 163, fn. 10; see *People v. Villanueva* (2008) 169 Cal.App.4th 41, 51-52 ["[D]efendant's assertion of accident may be disregarded by the jury in an appropriate case, and will not foreclose jury instruction on self-defense when there exists substantial evidence that the shooting was intentional (and met other requirements of self-defense)"].)

*2. There Was Insufficient Evidence to Require Sua Sponte Instructions*

23

*on the Imperfect Self-defense Theory of Voluntary Manslaughter*

> There was no substantial evidence from which the jury could have concluded defendant killed Rajah due to an honest but unreasonable belief that he needed to defend himself from an imminent threat to his life or body. Defendant contends support for the instruction can be found in his and Crawford's testimony that numerous people were throwing objects at his vehicle, his testimony that Rajah was trying to get him out of his vehicle so Rajah could beat him up, and his testimony that if the "mob" "got a hold of" him it would be "the end" of him. But defendant did not testify that he believed the mob, which was across the street, posed an imminent threat to him as he sat in his vehicle. Indeed, defendant's testimony that he drove towards the mob in order to disperse it and preserve his reputation is inconsistent with the notion that he believed they posed an imminent threat of great bodily harm. Accordingly, the trial court did not err in failing to instruct on the doctrine of imperfect self-defense.

ECF 15, Exh. G at 11-13.

Petitioner suggests that the trial court's failure to instruct the jury on imperfect self-defense violated his rights under California law. Petition at 44-46; *but see* Traverse at 22 ("Respondent contends that petitioner is an advancing an argument of error based on a violation of California law. This is incorrect." (internal citations omitted)). The Court again emphasizes that a claim based in state law is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 71-72 ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."); *Van Pilon*, 799 F.2d at 1342 (9th Cir. 1986) (claims that merely challenge correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights) (citation omitted).

The Court turns to consider Petitioner's claim in the context of federal law. Nijmeddin argues that the trial court was required to give an imperfect self-defense voluntary manslaughter instruction because there was ample evidence to support such an instruction. Petition at 57 (discussing evidence). But Petitioner's claim under *Mathews* is incognizable because, as discussed at length above, the Supreme Court's holding there concerned a defendant's rights under federal criminal procedure—not the Constitution. 485 U.S. at 63.

United States District Court
Northern District of California

To the extent Nijmeddin seeks relief under a theory that the state trial court was required to give an imperfect self-defense voluntary manslaughter instruction because it is a lesser included offense of first degree murder, his claim cannot proceed. This Court is not aware of any clear Supreme Court precedent that clearly establishes such a right, nor has Petitioner identified any. Indeed, the Supreme Court has explicitly reserved this question. *Beck v. Alabama*, 447 U.S. 625, 637, 638 n.14 (1980) (holding that the failure to give a lesser included offense instruction supported by the evidence in a capital case is constitutional error but reserving judgment "whether the Due Process Clause would require the giving of such instructions in a non-capital case"); *see also Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("the failure of a state trial court to instruct on lesser included offenses in a noncapital case does not present a federal constitutional question."); *United States v. Rivera-Alonzo*, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases.") (citing *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000)).

Nor does *Mullaney* provide Nijmeddin a cognizable ground for relief under 28 U.S.C. § 2254(d). Relying on *Mullaney*, Nijmeddin suggests that the trial court's failure to instruct on voluntary manslaughter based on imperfect self-defense relieved the prosecution of the burden of establishing each element of murder beyond a reasonable doubt. Petition at 57. There can be no doubt that the Due Process Clause imposes on the prosecution "the burden of proving all elements of the offense charged" and requires that the prosecution "persuade the factfinder 'beyond a reasonable doubt'" of the facts necessary to establish each of the elements of the charged offense. *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (citations omitted). In *Mullaney*, the Supreme Court held that in homicide cases "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented*." 421 U.S. at 704 (emphasis added); *see also People v. Rios*, 23 Cal. 4th 450

(2000) ("If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case, the People must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice." (emphasis in original) (internal citations omitted) (citing *Mullaney*, 421 U.S. at 704)). But the implications of *Mullaney* are not as sprawling as Nijmeddin suggests. Under the Maine law at issue in *Mullaney*, malice aforethought was an essential element of the crime of murder. *Id*. at 685-686. The *Mullaney* jury was instructed that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought would be conclusively implied unless the defendant proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. *Id*. at 686-687.[1] The Supreme Court explained that, in violation of the Due Process Clause, the government shifted the burden of proof to the petitioner-defendant to prove that a killing occurred in the heat of passion and on sudden provocation in order to reduce homicide to manslaughter. *Id*. at 694, 704; *see also id*. at 701 ("In this case . . . the State has affirmatively shifted the burden of proof to the defendant. The result, in a case such as this one

---

[1] The Supreme Court's full summary of the jury instructions is as follows:

> The trial court instructed the jury that Maine law recognizes two kinds of homicide, murder and manslaughter, and that these offenses are not subdivided into different degrees. The common elements of both are that the homicide be unlawful—i.e., neither justifiable nor excusable—and that it be intentional. The prosecution is required to prove these elements by proof beyond a reasonable doubt, and only if they are so proved is the jury to consider the distinction between murder and manslaughter.

> The jury was further instructed, however, that if the prosecution established that the homicide was both intentional and unlawful, malice aforethought was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation. The court emphasized that 'malice aforethought and heat of passion on sudden provocation are two inconsistent things,'; thus, by proving the latter the defendant would negate the former and reduce the homicide from murder to manslaughter. The court then concluded its charge with elaborate definitions of 'heat of passion' and 'sudden provocation.'

421 U.S. at 685-686 (internal citations omitted).

where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction.").

The Ninth Circuit discussed *Mullaney* at length in *Dunckhurst v. Deeds*, 859 F.2d 110 (9th Cir. 1988). In *Dunckhurst*, petitioner Dunckhurst argued that "his murder conviction was obtained in violation of his constitutional due process rights because the Nevada trial court rejected his proposed jury instructions explicitly placing the burden of proof on the state to negate his irresistible impulse defense." *Id*. at 112. According to Petitioner, the trial court's refusal to offer such an instruction violated *Mullaney*. The Ninth Circuit disagreed, explaining that "the jury was properly instructed that the State was burdened with proving beyond a reasonable doubt every element of the offense of first degree murder. The instructions cautioned that, to convict Dunckhurst of first degree murder, the jury must find beyond a reasonable doubt that he committed (1) an unlawful killing, (2) with deliberation and premeditation, and (3) with malice aforethought . . ." *Id*. at 113. The appellate court explained that to find the petitioner guilty

> the jury necessarily had to find that the State proved beyond a reasonable doubt that Dunckhurst killed Schwartz with malice aforethought, i.e., without adequate provocation. No burden was placed on Dunckhurst to show that adequate provocation existed. *Mullaney*'s admonition that the State bears the burden of proving the absence of provocation, where lack of adequate provocation is an element of the crime charged, was satisfied.

*Id*. The Ninth Circuit's discussion of *Mullaney* in *Dunckhurst* made clear that *Mullaney* does not apply where no burden is placed on a defendant "to show that adequate provocation existed." *Id*; *see also Patterson v. New York*, 432 U.S. 197, 215 (1977) ("*Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense.").

In sum, *Mullaney* does not stand for the proposition that a defendant is entitled to an imperfect self-defense instruction as a matter of course. *See* Petition at 57. Instead, *Mullaney* "held

unconstitutional a mandatory rebuttable presumption that shifted to the defendant a burden of persuasion on the question of intent." *Francis v. Franklin*, 471 U.S. 307, 317 (1985); *see also Patterson*, 432 U.S. at 215. While this issue was raised, albeit briefly, in front of the state court, it does not appear as if the state court squarely addressed it. ECF 15, Exh. C at 36 (citing *Rios*, 23 Cal. 4th 450); ECF 15, Exh. G at 11-13. Instead, it focused its discussion on whether there was evidence supporting an imperfect self-defense instruction. This Court thus presumes that the state court adjudicated this aspect of Nijmeddin's claim on the merits and turns to consider the arguments or theories that would have supported the California Supreme Court's ultimate denial of his claim. *See Harrington*, 562 U.S. at 99, 102.

Ample argument would have supported the state court in denying Nijmeddin's *Mullaney* claim. *Mullaney* only provides Nijmeddin a potential avenue for relief if his jury instructions shifted the burden of proof on an essential element. There is no indication here that the jury instructions shifted to Nijmeddin a "burden of persuasion on the question of intent." *Francis*, 471 U.S. at 317. Nijmeddin was charged with second degree murder of Rajah. ECF 15, Exh. G at 1. The relevant jury instruction stated:

> "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state. The instruction for each crime and allegation explains the intent or state of mind required . . .
>
> . . .
> The defendant is charged in Count 1 with murder in violation of Penal Code Section 187. To prove the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person. And, two, when the defendant acted, he had a state of mind called malice aforethought. And, three, he killed without lawful excuse or justification.
>
> There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if, one, he intentionally commit an act. Two, the natural and probable consequence of the acts were dangerous to human life.

United States District Court
Northern District of California

> Three, at the time he acted, he knew his act was dangerous to human life. And, four, he deliberating acted with conscious disregard for human life.
>
> . . .
>
> If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree . . .

ECF 14, Exh. B, Vol. 7 at 1809, 1819-1820. Thus, to convict Nijmeddin of second degree murder, the jury was instructed that they must find beyond a reasonable doubt that he (1) caused the death of another person, (2) with malice aforethought, (3) without lawful excuse or justification. *Id*. at 1819. In light of these instructions, it would have been eminently reasonable for the state court to conclude that, as in *Dunckhurst*, "the jury necessarily had to find that the State proved beyond a reasonable doubt that [Nijmeddin] killed [Rajah] with malice aforethought, i.e., without adequate provocation. No burden was placed on [Nijmeddin] to show that adequate provocation existed." 859 F.2d at 113. And Nijmeddin does not argue otherwise. *See* Petition at 57 (focusing on inherent failure to give lesser included offense instruction as opposed to burden allocated in the jury instruction). Because the California Supreme Court could have reasonably concluded that the jury instructions did not shift the burden of proof in violation of *Mullaney*, Nijmeddin's claim fails.

### D.  Exclusion of Evidence that Rajah had Cocaine in his Blood

On direct appeal, Nijmeddin argued that the trial court's exclusion of evidence that Rajah had cocaine in his system at the time of his death amounted to an abuse of discretion under state law, and a violation of Petitioner's federal constitutional right to present a defense. ECF 15, Exh. C at 49-61. Recognizing that that the issue might be forfeited because of trial counsel's failure to make an offer of proof as to relevance of the evidence, Nijmeddin alternatively argued that any forfeiture amounted to ineffective assistance of counsel under *Strickland*. ECF 15, Exh. C at 52, 63-65. The California Court of Appeal rejected these arguments in its last-reasoned decision addressing the contention, *Ylst*, 501 U.S. at 805:

### 2. *Legal Principles*

"Our review of allegedly erroneous exclusions of evidence is governed by Evidence Code section 354. '"As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the 'substance, purpose, and relevance of the excluded evidence. . . .'"'" (*People v. Peoples* (2016) 62 Cal.4th 718, 744.) Failure to do so results in forfeiture unless "[t]he rulings of the court made compliance with subdivision (a) futile" or "[t]he evidence was sought by questions asked during cross-examination or recross-examination." (§ 354, subds. (b) & (c).)

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." (*Id.* at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Id.* at p. 697.)

### 3. *Analysis*

[Petitioner] contends the issue was preserved by his filing stating an intent to object "to exclusion of evidence of victim['s] intoxication during the incident." We disagree. Section 354, subdivision (a) requires that the relevance of the excluded evidence be made known to the court. [Petitioner's] written objection did not explain the purported relevance of the evidence—that it would bolster the heat of passion defense. Nor did defense counsel explain the relevance of the evidence when given the opportunity in open court. Accordingly, the claim is forfeited unless "[t]he rulings of the court made compliance with subdivision (a) futile" or "[t]he evidence was sought by questions asked during cross-examination or recross-examination." (§ 354, subds. (b) & (c).) [Petitioner] argues compliance would have been futile because "the trial court considered both the prosecution's motion and the defense's objection to that

motion." Again, we disagree. The relevance of the evidence was not briefed. And, in ruling on evidence of Rajah's past drug use, the court indicated a willingness to admit drug evidence that was relevant to the incident. The evidence was not sought on cross-examination. Accordingly, we conclude the claim is forfeited because defense counsel failed to make an offer of proof as to the relevance of the evidence to the defense. (*People v. Capistrano* (2014) 59 Cal.4th 830, 867.)

Next, we consider whether trial counsel's failure to make an offer of proof amounted to ineffective assistance of counsel. We need not decide whether defense counsel's performance was deficient because we determine that [Petitioner] has not shown prejudice from counsel's failure to make an offer of proof or to otherwise get the evidence admitted.

An unlawful killing constitutes voluntary manslaughter, as opposed to murder, where one of two circumstances precludes the formation of malice: (1) the defendant kills in a sudden quarrel or heat of passion, or (2) the defendant kills in an actual but unreasonable belief in the need for self-defense. (Pen. Code, § 192; Elmore, supra, 59 Cal.4th at pp. 133-134.) A person kills in a heat of passion where (1) the victim's conduct is "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" and (2) they actually kill under a heat of passion caused by the victim's conduct. (Manriquez, supra, 37 Cal.4th at pp. 583-584.) [Petitioner] contends the excluded blood evidence tended to prove Rajah's conduct was sufficiently provocative because, according to [Petitioner], it is "common understanding[]" that cocaine is associated with "heightened aggression."

The jury heard other evidence regarding the provocative nature of Rajah's conduct. [Petitioner] and every eyewitness testified that Rajah threw a chair at the windshield of [Petitioner]'s vehicle while [Petitioner] was engaged in an argument that did not involve Rajah. The chair broke the windshield. [Petitioner] and Crawford testified that Rajah threw other objects at the vehicle as well. In finding [Petitioner] guilty of second degree murder, the jury obviously rejected his defense theory of heat of passion.

[Petitioner] has not shown it is reasonably probable that the jury would have accepted that theory had it known that Rajah had some unknown amount of cocaine in his system at the time of his death. Even assuming it is "common understanding[]" that cocaine is associated with "heightened aggression," something we strongly doubt, there already was evidence that Rajah behaved in an aggressive manner towards [Petitioner].

We conclude that it is not reasonably probable that the outcome of the trial would have been different had defense counsel succeeded in efforts to have the blood evidence admitted at trial. Accordingly, we reject defendant's ineffective assistance of counsel claim.

ECF 15, Exh. G at 14-17.

Petitioner appears to re-raise both arguments in his federal habeas petition. *See* Petition at 60 ("The Trial Court Erred in Excluding Evidence . . . Defense Counsel was Prejudicially Ineffective in Failing to Obtain a Ruling on the Admissibility . . ."). However, the first part of Petitioner's claim—whether the trial court erred in excluding evidence the Rajah had cocaine in his blood—is not briefed beyond the title of the section header. *See* Petition at 60-62 (focusing on *Strickland*); Traverse at 25-27 (same). Indeed, Nijmeddin does not identify any federal law that the trial court ran amok of in excluding the evidence at issue. *See* 28 U.S.C. § 2254(d)(1). As such, his claim fails on this ground.

The Court turns to consider Petitioner's second argument: Whether Defense Counsel Rutledge rendered ineffective assistance by failing to obtain a ruling on the admissibility of evidence of Rajah's cocaine use. The Court of Appeal rejected this argument on direct appeal, concluding that Nijmeddin failed to show prejudice from Defense Counsel Rutledge's failure to make an offer of proof or to otherwise get the evidence admitted. ECF 15, Exh. G at 15-17. According to Petitioner, the Court of Appeal's conclusion was an unreasonable application of *Strickland*. Petition at 62. In particular, Petitioner argues that the Court of Appeal's "conclusion is deficient in that it is based on a failure to consider the significance of cocaine use to Rajah's behavior and [P]etitioner's perceptions of this behavior as relevant to the 'heat of passion' defense present in this case." Petition at 61.

The state Court of Appeal reasonably applied *Strickland* in rejecting Petitioner's instant claim. To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his counsel's performance was deficient and that he suffered prejudice. *Strickland*, 466 U.S. at 687. The state court reasonably concluded that, under the second prong of *Strickland*, "[Petitioner] has not shown prejudice from counsel's failure to make an offer of proof or to otherwise get the evidence admitted." ECF 15, Exh. G at 16. In support of this conclusion, the court reasoned that, in finding Petitioner guilty of second degree murder, the jury rejected Petitioner's heat-of-passion defense—despite ample evidence that Rajah behaved provocatively towards Petitioner. *See,*

*e.g., id.* at 16 ("The jury heard other evidence regarding the provocative nature of Rajah's conduct. Defendant and every eyewitness testified that Rajah threw a chair at the windshield of defendant's vehicle while defendant was engaged in an argument that did not involve Rajah. The chair broke the windshield."). In light of this rejection by the jury and the evidentiary record, it was rational for the state court to conclude under the second prong of *Strickland* that "[Petitioner] has not shown it is reasonably probable that the jury would have accepted [Petitioner's heat-of-passion defense] theory had it known that Rajah had some unknown amount of cocaine in his system at the time of his death." *Id.* at 17.

In sum, Nijmeddin has failed to show that the the state court's ruling on this claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103. His habeas claim cannot stand.

### E.  Admission of Evidence about Hatchet

On July 26, 2012, Monterey County District Attorney's Office investigator Allen Rowe inspected Petitioner's impounded vehicle and observed what appeared to be a wooden handle sticking out from underneath the floor mat on the driver's side. ECF 14, Exh. 9, Vol. 5 at 1207-09; *see also* ECF 15, Exh. G at 5-6. Rowe pulled back the floor mat and saw a hatchet. ECF 14, Exh. 9, Vol. 5 at 1210. The trial court admitted a photograph of the hatchet based on its determination that (1) it was "probative to a state of mind of premeditation and deliberation" of Petitioner and (2) its admission would not lead to undue confusion or waste of time. ECF 14, Exh. B, Vol. 1 at 33-34; *see also* Petition at 62-63.

The California Court of Appeal affirmed the trial court's decision to admit the photograph of the hatchet. ECF 15, Exh. G at 17-20. In its last-reasoned decision on the issue, *Ylst*, 501 U.S. at 805, the court explained:

*1. Legal Principles and Standard of Review*

Only relevant evidence is admissible. (§ 350.) The Evidence

Code defines "relevant evidence" broadly as "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210, italics added.) "'[T]he trial court has broad discretion to determine the relevance of evidence.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.) "On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) For purposes of section 352, evidence is "prejudicial" if it "'"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).) "'"[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'" (*People v. Scott* (2011) 52 Cal.4th 452, 491.) "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*Kipp*, *supra*, at p. 1121.)

*2. Admission of the Hatchet Evidence Was Not an Abuse of Discretion*

Generally, "it is error to admit evidence that other weapons [not used in the charged crime] were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [error to admit evidence of defendant's prior possession of handgun where prosecutor did not claim the weapon was used in charged murders]; *see also People v. Riser* (1956) 47 Cal.2d 566, 577 [error to admit evidence of a revolver found in defendant's possession where evidence showed a different weapon was used in the crime], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [error to admit evidence of knives that were not murder weapon].) In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of no relevant consequence to determination of the

guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.) However, "when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible." (*People v. Cox* (2003) 30 Cal.4th 916, 956 (Cox), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) For example, in *People v. Prince* (2007) 40 Cal.4th 1179, 1249, the court upheld the admission of knives that "apparently were not used to inflict the fatal wounds upon the murder victims" because they "did not simply constitute bad character evidence"; they "bore some relevance to the weapons shown by the evidence to have been involved in other charged crimes."

Here, [Petitioner] was charged with attempted willful, deliberate, and premeditated murder of Chino (count 2; Pen. Code, §§ 664/187, subd. (a)). The premeditation element was in dispute. Evidence that [Petitioner] carried a hatchet with him on the day of the incident was relevant to premeditation. (S*ee People v. Jablonski* (2006) 37 Cal.4th 774, 821-822 [wire handcuffs and stun gun found in defendant's vehicle but not used in murders admissible because "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation"].) The hatchet evidence supported an inference that [Petitioner] sought out Chino with an intent to use deadly force to resolve their ongoing dispute. Therefore, evidence of the hatchet was not bad character evidence; it did not merely show [Petitioner] was the type of person who carried deadly weapons. Rather, the hatchet constituted circumstantial evidence of [Petitioner]'s intent and state of mind on the day of the incident. Accordingly, the trial court correctly concluded that the hatchet had probative value.

With respect to prejudice, for purposes of [Cal. Evidence Code] section 352, "we are concerned only with the possibility of an emotional response to the proposed evidence that would evoke the jury's bias against defendant as an individual unrelated to his guilt or innocence." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 417.) A hatchet is a tool that has uses other than as a deadly weapon. There was no evidence defendant ever used the hatchet as a weapon. And there was evidence Chinatown is a dangerous place where possession of a defensive weapon might be advisable. In view of the foregoing, the hatchet evidence was not likely to evoke a strong emotional bias against [Petitioner].

For the foregoing reasons, we perceive no abuse of discretion in the court's conclusion that the probative value of the hatchet evidence was not substantially outweighed by the probability that its admission would create substantial danger of undue prejudice.

*Id.*

Petitioner now contends that the introduction of the photograph violated the California

Evidence Code and the Due Process Clause of the Fourteenth Amendment. Petition at 3, 64-66.

In general, simple errors of state law do not warrant federal habeas relief. *Estelle*, 502 U.S. at 67. "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir.1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995) (citing *Estelle*, 502 U.S. at 67–68). To establish that admitting certain evidence violated a criminal defendant's due process rights, Petitioner must demonstrate that the admission of the evidence "offend[ed] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson*, 432 U.S. at 202; *see also Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." *Jammal*, 926 F.2d at 920 (emphasis in original).

Petitioner first argues that the state appellate court erroneously "fail[ed] to discuss [state] case law cited in [P]etitioner's opening brief which firmly establishes that where, as here, the prosecution relied on evidence regarding a specific type of weapon to prove a crime—here, [P]etitioner's vehicle— it was error to admit evidence that *other*, unused weapons were found in the defendant's possession…" Petition at 64 (emphasis in original) (internal citations omitted) (citing *People v. Barnwell*, 41 Cal.4th 1038 (2007), *People v. Riser*, Cal.2d 566 (1956), *People v. Archer*, 82 Cal.App.4th 1380 (2000)). According to Petitioner, the failure to address the cited caselaw "led the [state court] to avoid the obvious conclusion advanced by [P]etitioner" that the admission of the hatchet photograph violated the California Evidence Code. Petition at 64-65. But Petitioner fails to cite to any *federal* caselaw, let alone a rule clearly established by the Supreme Court, to support his claim for habeas relief on this ground. This argument fails to meet the standard set out in *Estelle v. McGuire*. 502 U.S. at 67-68 ("We have stated many times that 'federal habeas corpus relief does

not lie for errors of state law.' Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." (internal citations omitted)); *see also Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999) ("a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.").

Petitioner further argues that the trial court violated the Due Process Clause by admitting the hatchet photograph because there were no permissible inferences a jury could draw from the evidence. Petition at 64. Petitioner contends that the trial court's contrary conclusion and the state court of appeal's affirmance of that conclusion was "erroneous and contrary to settled federal constitutional law." *Id*. In support of this argument, Petitioner cites to *Kipp v. Davis*, 971 F.3d 939 (9th Cir. 2020), *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993), and *Old Chief v. United States*, 519 U.S. 172 (1997) for the proposition that "there is a clear violation of due process, cognizable on federal habeas review, where evidence of weapon possession unrelated to a crime is admitted only to show a propensity to use weapons, or a fascination with them." Traverse at 28; *see also* Petition at 65.

The state court was reasonable when it rejected Nijmeddin's argument that the admission of the hatchet photograph violated the Due Process Clause because "it goes only to [Petitioner's] character and there are 'no permissible inferences' the jury may draw from it." ECF 15, Exh. C at 69. In particular, the state court found that

> Evidence that defendant carried a hatchet with him on the day of the incident was relevant to premeditation. The hatchet evidence supported an inference that defendant sought out Chino with an intent to use deadly force to resolve their ongoing dispute. *Therefore, evidence of the hatchet was not bad character evidence*; it did not merely show [Petitioner] was the type of person who carried deadly weapons. Rather, *the hatchet constituted circumstantial evidence of [Petitioner]'s intent and state of mind* on the day of the incident.

ECF 15, Exh. G at 19 (emphasis added) (internal citation omitted). In other words, the state court

explicitly rejected that the hatchet photograph was introduced as impermissible character evidence and concluded instead that the photograph could support a proper inference about Petitioner's intent and state of mind. This conclusion was not irrational because the presence of the hatchet inside Nijmeddin's car could have supported an inference by the jury that Nijmeddin had a premeditative mindset—as opposed to one arising out of a heat of passion or confusion. This is particularly true given that "most people don't carry axes in their car right at their feet or right under the seat." ECF 15, Exh. B at 34.

*Kipp, McKinney*, and *Old Chief* are inapt here. In *McKinney*—a pre-AEDPA case—the petitioner was convicted of killing his mother with a knife. 993 F.2d at 1381-1382. The trial court admitted evidence that the petitioner had possessed two knives, was proud of his knife collection, sometimes strapped on a knife to his body while wearing camouflage pants, and used a knife to scratch the words "Death is His" on his closet door. *Id*. at 1382. The Ninth Circuit held that the admission of evidence of petitioner's "fascination with death and knives" to convict him for the stabbing of his mother violated his due process right to a fair trial because the evidence was relevant *only* as character evidence—to show petitioner's propensity to act as someone who was fascinated with knives and led a "commando lifestyle." *Id*. at 1385. "It served only to prey on the emotions of the jury, to lead them to mistrust McKinney, and to believe more easily that he was the type of son who would kill his mother in her sleep without much apparent motive." *Id*. Here, the state court reasonably concluded that the hatchet photograph was *not* introduced as impermissible character evidence, but rather as proof of Petitioner's premeditative mindset or intent. ECF 15, Exh. G at 17-20. Similarly, the Ninth Circuit in *Kipp* expressly acknowledged that there is "no due process violation where there were permissible inferences that the jury could draw from the challenged evidence." *Id*. at 956 (citing cases); *see also Old Chief*, 519 U.S. at 181 ("'Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt.'"). Where, as

here, the state court reasonably points to a permissible inference the jury could draw from the challenged evidence, a habeas petition cannot stand. *See Jammal*, 926 F.2d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." (emphasis in original)).

### F.  Failure to Provide Limiting Instruction about Hatchet

Petitioner contends that trial counsel provided prejudicial deficient performance when he failed to request a "limiting instruction telling the jury that the axe evidence could not be used to show bad character or a propensity to use weapons." Petition at 3, 66-68. The California Court of Appeal rejected this argument in the last-reasoned decision addressing the contention, *Ylst*, 501 U.S. at 805:

> [Petitioner] argues defense counsel was ineffective in failing to request that the jury be instructed that the hatchet evidence could not be used for the purpose of determining that [Petitioner] had a propensity to commit murder. He contends that, absent such a limiting instruction, jurors may have drawn the impermissible inference that [Petitioner] was predisposed to commit murder.
>
> We proceed immediately to the prejudice prong of the *Strickland* analysis, under which the question is whether [Petitioner] has established a reasonable probability that the result of the trial would have been different had trial counsel successfully requested a limiting instruction. [Petitioner] was convicted of second degree murder, which is the unlawful killing of a human being with malice aforethought but without the additional elements of willfulness, premeditation, and deliberation. (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Second degree murder may involve either express malice (intentional, unpremeditated killing) or implied malice (killing resulting from an intentional dangerous act carried out with conscious disregard for life). (*People v. Rogers* (2006) 39 Cal.4th 826, 867; CALJIC Nos. 8.30, 8.31.) There was overwhelming evidence that [Petitioner] carried out a dangerous act—driving in the direction of pedestrians at a high rate of speed—with conscious disregard for life. [Petitioner] admitted as much at trial. He testified that he intentionally drove "quickly" in the direction of a crowd of people, coming within 10 feet of Rajah, while wearing eyeglasses with an out of date prescription and while his windshield was dirty and cracked. His testimony alone proved the elements of implied malice second degree murder. Eyewitnesses corroborated [Petitioner]'s testimony, testifying that [Petitioner] chased a fleeing Rajah at a close distance.

United States District Court
Northern District of California

> Given the overwhelming evidence that [Petitioner] committed second degree murder, there is no reasonable probability that he would have received a more favorable verdict had defense counsel successfully requested a limiting instruction.

ECF 15, Exh. G at 20-21.

As discussed at length in Section III.A, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla*, 559 U.S. at 371. To garner relief on a claim of ineffective assistance of counsel a defendant must show both that his or her attorney provided deficient performance, and that prejudice ensued as a result. *Strickland*, 466 U.S. at 687-96. To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id.* at 689. In other words, in evaluating allegations of deficient performance the reviewing court's scrutiny of counsel's actions or omissions is highly deferential. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The petitioner's burden is to show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. The issue is not what the best lawyer would have done, or even what a majority of good lawyers would have done, but whether some reasonable lawyer could have acted in the challenged manner when facing the same circumstances as counsel in the present case. *Coleman*, 150 F.3d at 1113. The inquiry into counsel's performance is "extremely limited." *Id.*

Petitioner contends that the state court's opinion was objectively unreasonable because it "mischaracterize[d]" evidence that Petitioner acted with malice as overwhelming and paid not "the slightest attention to the manner in which the prosecutor took advantage of the absence of a proper limiting instruction to argue propensity." Petition at 67. Petitioner makes this challenge under both

prongs of 28 U.S.C. § 2254(d). Traverse at 32 ("The state court's conclusions, however, are contrary to the record, contrary to *Strickland*, and amount to an objectively unreasonable application of *Strickland*.").

The state court's decision was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2). The state court reasonably supported its finding that "[t]here was overwhelming evidence that [Petitioner] carried out a dangerous act—driving in the direction of pedestrians at a high rate of speed—with conscious disregard for life" by pointing to specific record evidence. ECF 15, Exh. G at 20-21. For example, the state court pointed to Petitioner's testimony that "he intentionally drove 'quickly' in the direction of a crowd of people, coming within 10 feet of Rajah, while wearing eyeglasses with an out of date prescription and while his windshield was dirty and cracked." *Id*. It also identified eyewitness testimony that corroborated Petitioner's testimony. *Id*. Nijmeddin does not dispute the existence or characterization of any specific evidence, but rather argues that the state court "ignor[ed] factors…demonstrating that this was a close case for the jury—e.g., the obvious point that the same jury that convicted [Petitioner] of murder as to Rajah found him not guilty of attempted murder as to victim Chino, and guilty of the lesser crime of attempted involuntary manslaughter premised on heat of passion and provocation." Petition at 67.

Nijmeddin's focus on what he perceives to be a contradiction between the jury verdict and the trial court's determination of facts is misplaced. The § 2254(d)(2) "standard for finding that a state court made an unreasonable determination of the facts is 'daunting,' and 'will be satisfied in relatively few cases.'" *Jones v. Harrington*, 829 F.3d 1128, 1136 (9th Cir. 2016) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). A state court decision may rest on an unreasonable factual determination within the meaning of § 2254(d)(2) where the state court "plainly misapprehend[s] or misstate[s] the record in making their findings, and…the misapprehension goes to a material factual issue that is central to the petitioner's claim." *Taylor*, 366 F.3d at 1001.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nijmeddin falls short of this standard. Indeed, Nijmeddin fails to point to any evidence that the state court misstated or failed to consider in making its factual determination. *See, e.g., Campos v. Stone*, 201 F. Supp. 3d 1083, 1097 (N.D. Cal. 2016) ("Insisting a suspect will be in trouble with the prosecutor unless he makes a statement consistent with fake scientific evidence, which the officers repeatedly characterize as the objective 'truth,' is vastly and categorically different from merely urging a suspect to tell the truth in a vacuum."). That the jury opted not to credit evidence of Nijmeddin's malice against Chino does not render the trial court's evidentiary findings per se unreasonable.

Nor was the state court's decision based on an unreasonable application of *Strickland*. *See* 28 U.S.C. § 2254(d)(1). The Court of Appeal focused its decision on the second prong of *Strickland*. ECF 15, Exh. G at 20-21. The court highlighted the "overwhelming evidence" that supported a finding that Petitioner carried out a dangerous act with conscious disregard for life, such as the testimony by eyewitnesses and Petitioner himself. *Id*. This evidence bolstered the court's conclusion that "there is no reasonable probability that he would have received a more favorable verdict had defense counsel successfully requested a limiting instruction." *Id*. Petitioner argues that the state court's mischaracterization of the evidence does not support this conclusion. Petition at 68. But, as explained above, the state court did not make an unreasonable determination of the facts in light of the presented evidence. *See* Traverse at 35 (acknowledging that his claim under 28 U.S.C. § 2254(d)(1) is in part dependent on his claim under 28 U.S.C. § 2254(d)(2)). Petitioner also argues that "the state Court's *Strickland* analysis is crippled by its abject failure to discuss the prosecutor's manifestly improper use of the axe evidence to show a propensity to harm persons with a weapon." Petition at 68. But the Court, in considering Petitioner's claim in Section III.E, has already considered and rejected this argument. Finally, Petitioner's citation to *Garceau v. Woodford*, *see* Petition at 67, is inapt because there, the trial court "*affirmatively* invit[ed] the jury to draw [a]

propensity inference." 275 F.3d 769, 275 (9th Cir. 2001).[2] There is no indication such an instruction was given here.

At bottom, Petitioner's claim does not warrant an order granting federal habeas relief under either prong of 28 U.S.C. § 2254(d).

### G. Cumulative Error

Nijmeddin's final argument is that the cumulative effect of multiple prejudicial errors violated his due process rights and rendered his trial fundamentally unfair. Petition at 68-70.

The Court first addresses the procedural posture of Nijmeddin's cumulative error claim. On direct review, Petitioner argued that his trial "was riddled with errors prejudicial to his case, the cumulative effect of which made his trial fundamentally unfair." ECF 15, Exh. C at 85. Petitioner specifically highlighted (1) the court's failure to instruct on perfect self-defense; (2) the court's failure to instruct on imperfect self-defense; (3) the court's exclusion of evidence that Rajah had cocaine in his blood at the time of his death; (4) the court's admission of the hatchet photograph; and (5) the court's failure to appoint conflict-free substitute counsel to investigate Defense Counsel Rutledge's admission of ineffective assistance of counsel in failing to call expert witness Ferrari to testify at trial. *Id*. at 85-87. Each of these reasons was raised as an individual basis for appeal. *See id*. at ii-v. Relevant here, Nijmeddin's claim regarding Defense Counsel Rutledge's failure to

---

[2] The jury instruction, as excerpted by the Ninth Circuit is as follows:

> Evidence has been introduced for the purpose of showing that the defendant committed other crimes other than that for which he is on trial.
> Such evidence, if believed, may be considered by you *for any purpose,* including *but not limited to* any of the following:
> *His character or any trait of his character;*
> *His conduct on a specific occasion ....*

275 F.3d at 273 (emphasis in original).

procure the trial testimony of Ferrari was predicated on a theory that the trial court erred in failing

to conduct a hearing pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970) and to appoint substitute

counsel to investigate a possible motion for a new trial based on Rutledge's ineffective assistant of

counsel. ECF 15, Exh. C at 78-83; ECF 15, Exh. G at 21-24.

The state appellate court rejected Petitioner's cumulative error argument:

> Finally, defendant argues the cumulative effect of the alleged errors
> was to deprive him of his right to due process. "Under the
> cumulative error doctrine, the reviewing court must 'review each
> allegation and assess the cumulative effect of any errors to see if it
> is reasonably probable the jury would have reached a result more
> favorable to defendant in their absence.'" (*People v. Williams*
> (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative
> error 'is whether defendant received due process and a fair trial.'"
> (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) We have found
> no errors. Therefore, defendant's claim of cumulative error must
> fail.

ECF 15, Exh. G at 24.

In his state habeas petition, Petitioner raised a slightly different claim arising out of Defense

Counsel Rutledge's failure to procure the trial testimony of Ferrari. ECF 15, Exh. F at 46-67. Instead

of contending that the trial court erred under *Marsden*, as he did in his direct appeal, Petitioner

argued that Defense Counsel Rutledge erred under *Strickland*. *Compare* Exh. C at 78-83 *with* ECF

15, Exh. F at 46-67. The California Court of Appeal denied Petitioner's habeas petition without

comment, ECF 15, Exh. H, and the California Supreme Court denied the review petition without

comment, ECF 15, Exh. M.

According to the Respondent, Petitioner's cumulative error claim is unexhausted because he

failed to raise his first claim—ineffective assistance of counsel under *Strickland*—on direct appeal.

Response at 61. Respondent argues that "Petitioner's addition of this allegation of ineffective

assistance of counsel to his cumulative-error claim leaves the claim unexhausted and his habeas

petition subject to dismissal." *Id*. Respondent does not waive exhaustion, but asks that this Court

find that Petitioner "is not entitled to federal habeas relief on his cumulative-error claim even when

the Ferrari-evidence IAC claim is considered with all of the alleged trial court errors." *Id*. at 62 (citing 28 U.S.C. § 2254(b)(2)).

Petitioner, for his part, responds that his cumulative error claim "was properly raised and preserved in state court as to all of his direct appeal issues." Traverse at 36; *see also id*. at 37 ("[P]etitioner's direct appeal, and his cumulative error argument raised in that appeal, included a closely related claim of error based on trial counsel's ineffectiveness with respect to expert Ferrari"). Petitioner argues that it would have been impossible for him to raise this exact claim on direct appeal under California law because the claim was based on matters outside the record on appeal. Traverse at 37. He also argues that "California law further restricts habeas petitioners from raising, in a habeas petition, any grounds for relief which could have been presented on direct appeal." *Id*. (citing *In re Clark*, 5 Cal. 4th 750, 804 fn.2 (1993), *In re Waltreus*, 62 Cal.2d 218, 225 (1965)). As a result of state procedures, Petitioner submits that "he did present a cumulative error claim on direct appeal, and by securing an order from the state Court of Appeal that the appeal and habeas be 'considered together,' and then filing his parallel exhaustion petitions as to appeal and habeas in the state supreme court on the same day, he has effectively exhausted the cumulative error claim presented herein." *Id*. at 38.

The Court need not resolve this procedural dispute. "[A] federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see, e.g., Brandon v. Arnold*, No. 14-CV-00172-SBA(PR), 2017 WL 1196808, at *19 (N.D. Cal. Mar. 30, 2017) (applying *Cassett*); *Vlahos-Schmidt v. Larkin*, No. 14-CV-05184-EMC, 2016 WL 3951646, at *15 (N.D. Cal. July 22, 2016) (same); *Gonzalez v. Yates*, No. C 11-02670 JSW PR, 2013 WL 1451163, at *12 (N.D. Cal. Apr. 9, 2013) (same); *Lee v. Adams*, No. C 08-1200PJHPR,

United States District Court
Northern District of California

2009 WL 3762416, at *5 (N.D. Cal. Nov. 9, 2009) (same). Such is the case here.

"Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant.'" *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). "[Courts] have granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle v. Runnels*, 505 F.3d 922, 933 (9th Cir. 2007)).

Where, as here, "there is no single constitutional error ..., there is nothing to accumulate to a level of constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *see also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if "no error of constitutional magnitude occurred, no cumulative prejudice is possible"). As the Court has explained above, the state court had a reasonable basis for finding no error occurred with regard to each of Nijmeddin's claims. Petitioner's cumulative error claim necessarily fails.

### H.  Certificate of Appealability

No certificate of appealability is warranted in this case. *See* Rule 11(a) of the Rules Governing § 2254 Cases (requiring district court to rule on certificate of appealability in same order that denies petition). Nijmeddin has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

### IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) Nijmeddin's petition for a writ of habeas corpus is DENIED;

United States District Court
Northern District of California

(2) A certificate of appealability is DENIED;

(3) The motions at ECF 30 and ECF 32 are TERMINATED as moot; and

(4) The Clerk shall enter judgment and close the file.

Dated: August 26, 2021

_____
BETH LABSON FREEMAN
United States District Judge